**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-398 (CKK)** |
| **v.** | : | |
| | : | |
| **ALBERT CIARPELLI,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Albert Ciarpelli to 6 months of incarceration, at the high end of the guideline range, twelve months of supervised release, 60 hours of community service, $500 in restitution, and a $25 special assessment.

### I.      Introduction

Defendant Albert Ciarpelli, a 68-year-old former Marine and real estate property manager, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Ciarpelli pleaded guilty to a single violation of 18 U.S.C. § 1752(1)(1), Entering or Remaining within a Restricted Building or Grounds. The government's recommendation is amply warranted here: Ciarpelli entered the U.S. Capitol Grounds immediately upon seeing other rioters violently breach a police line; he remained on Capitol Grounds for hours after his first breach of the restricted perimeter; he was among the vanguard of rioters who proceeded to the second-floor corridor immediately outside the Senate chamber; and he entered the building not once, but twice. Among similarly situated defendants who have pled guilty to a single count of § 1752(a)(1), Ciarpelli falls among the most culpable of January 6 misdemeanants. Although he has finally pled guilty, Ciarpelli has yet to express real remorse for his actions on January 6.

The Court must consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Ciarpelli's crime support a sentence of 6 months of incarceration in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, Doc. 65 at 1-3.

### Defendant Ciarpelli's Role in the January 6, 2021 Attack on the Capitol

Ciarpelli travelled from his home in upstate New York to Washington, D.C. on January 5, 2021 for the purpose of attending former President Trump's "Stop the Steal" rally at the Ellipse.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

On January 6, Ciarpelli attended the rally as planned and remained there for approximately two to three hours. Metadata from videos taken by Ciarpelli on his phone show that he was near the National Museum of African American History and Culture, on the National Mall, until at least 11:24 a.m. Ciarpelli then joined the amassing crowds walking from the "Stop the Steal" rally towards the U.S. Capitol.

Ciarpelli approached the Capitol from the west and was one of the first rioters to breach the restricted perimeter around Capitol Grounds established by U.S. Capitol Police. Specifically, videos from his phone show Ciarpelli near the Peace Circle at approximately 12:49 p.m. He was then only feet away at approximately 12:54 p.m. when other rioters assaulted the outnumbered police to breach the bike rack barricades erected at the Pennsylvania walkway between the Peace Circle and the northwest Capitol Grounds. *See* Images 1-3. He then stepped directly over the barricades that other rioters had torn down. *See* Image 3.



*Image 1: Still from Exhibit 1, a video Ciarpelli recorded on January 6 depicting rioters pushing against the police line at the Pennsylvania walkway*



*Image 2: Open source still showing Ciarpelli (circled in yellow) within feet of the about-to-collapse police line as the mob worked to breach the police line*



*Image 3: Open source still showing Ciarpelli (circled in yellow) stepping over downed bicycle barricades as police officers were forced to retreat to closer to the Capitol Building*

Ciarpelli proceeded to the West Plaza of the Capitol Building, where he was again within feet of rioters tearing barricades away from the police officers attempting to protect the Capitol. Indeed, Ciarpelli himself can be seen on body worn camera footage grasping onto a bike rack that

rioters were attempting to push into the police at 1:36 p.m. *See* Images 4 and 5. Ciarpelli was then

forced back into the crowd. *See* Image 6.



*Image 4: Still from Exhibit 2, Metropolitan Police Department body worn camera footage showing Ciarpelli (circled in yellow) grasping at a lifted bike rack barricade*



*Image 5: Open source still image of Ciarpelli (circled in yellow) grasping the bike rack barricade*



*Image 6: Still from Exhibit 2, Metropolitan Police Department body worn camera footage showing Ciarpelli (circled in yellow) as he was forced back into the crowd*

Undeterred by the police who were obviously struggling to push back the rioters, Ciarpelli again approached the police line with his phone in his hand, apparently filming the scene. *See* Image 7. He remained in front of that police line for several minutes, and on the West Plaza more generally for approximately 20 additional minutes.



*Image 7: Still from Exhibit 2, Metropolitan Police Department body worn camera footage showing Ciarpelli (circled in yellow) remaining on the West Plaza*

Ciarpelli then proceeded up to the Upper West Terrace by climbing underneath the scaffolding of the Inaugural Stage at approximately 1:56 p.m. Once he reached the Upper West Terrace, Ciarpelli followed other rioters looking to make entry into the building – he banged on the Parliamentarian Door using his fist and eventually followed rioters into the building through the Senate Wing Door at approximately 2:13 p.m., within approximately one minute of the first rioters entering the building. Before entering the building, Ciarpelli stood and watched as other rioters broke through glass windows near the Senate Wing Door. During this time, the crowd cheered on the rioters breaking down the windows and yelled things like "This is our f***ing country," and "This is our house." Once inside, the crowd continued to yell and chant.

Inside the U.S. Capitol building, Ciarpelli climbed the stairs to the second floor, where U.S. Capitol Police officers met Ciarpelli and other rioters at the Ohio Clock Corridor. That corridor is immediately outside the Senate chamber, where senators were still in the process of being evacuated.  The police successfully blocked the rioters' way, but, Ciarpelli and other rioters

around him yelled at the assembled officers. During this time, Ciarpelli continued to record photographs and videos on his phone.



*Image 8: Press photograph of Ciarpelli (circled in yellow) in the corridor outside the Senate chamber*



*Image 9: Press photograph of Ciarpelli (circled in yellow) yelling at officers in the corridor outside the Senate chamber*

Ciarpelli exited the Capitol building shortly after 2:30 p.m.  He later re-entered the building on its east side at approximately 3:13 p.m. He re-entered the building through the East Rotunda Doors among cheers of "let us in, let us in!" and blaring alarms.  Ciarpelli went into the Rotunda on this second trip, as officers were visibly working to clear the Rotunda, and he left through the same doors he entered at approximately 3:32 p.m., raising his fist in the air as he exited. In all, he unlawfully remained inside the building for approximately 35 minutes. More, the metadata from the videos he recorded on his cell phone indicate that he remained in and around the National Mall until approximately 5:45 p.m., shortly before the commencement of Mayor Muriel Bowser's 6 p.m. citywide curfew.

*Post-January 6 Interview*

On January 8, 2021, two days after the riot at the Capitol, the Central NY News posted an article on the internet identifying Ciarpelli as one of the participants in the January 6 riot at the Capitol. The same day, Ciarpelli's attorney contacted the U.S. Marshal Service, and in turn the FBI, on the understanding that there may have been an arrest warrant issued for his client.

On January 10, 2021, Ciarpelli submitted to a voluntary interview with the FBI and his counsel. Ciarpelli identified himself in several photographs from inside the Capitol Building on January 6, 2021. Ciarpelli confirmed during his interview that he had travelled to Washington, D.C. alone on January 5, 2021 to attend the former President's rally at the Ellipse. He reported that he had walked from his hotel to the rally, and that he followed the crowd from the rally to the Capitol. He stated that he did something that he knew he should not have and that he had made his way into the building via an open door with broken glass. Ciarpelli further stated that he spent his time inside the Building taking photographs and considered his time in the Building to be a "little adventure."

*The Charges and Plea Agreement*

On January 12, 2021, Ciarpelli was charged in a complaint with Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); Disorderly Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2): Disorderly Conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D); Obstructing, or Impeding Passage through or within the Grounds or any of the Capitol Buildings, 40 U.S.C. § 5104(e)(2)(E); and Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).

On November 14, 2023, the United States charged Ciarpelli with Entering or Remaining in a restricted building or grounds in violation of 18 U.S.C. 1752(a)(1) in a single-count Information. On January 4, 2024, Ciarpelli pleaded guilty to the Information, pursuant to a written plea agreement.

## III.     Statutory Penalties

Ciarpelli now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment; a fine of up to $100,000; a term of supervised release of not more than one year; and a $25 special assessment. In addition, under the terms of his plea agreement, the defendant must also pay $500 in restitution to the Architect of the Capitol. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government substantially agrees with the Sentencing Guidelines calculation set forth in the PSR, most of which the parties agreed to in the plea agreement. The government opposes the application of the 2-level Zero Point Offender Adjustment under §4C1.1, for the reasons explained below.[2] Accordingly, the government proposes that the correct guidelines calculation is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 36-45.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Here, the government agrees that Ciarpelli has no criminal history points. Nevertheless, the government disagrees that Ciarpelli's conduct was non-violent. By grabbing on to a bike rack that other rioters were already holding in the air and pushing into a police line, Ciarpelli personally contributed to the mayhem on the West Plaza. And, this conduct threatened violence to any police officer who could see the elevated racks headed towards them. Accordingly, the government

---

[2] The government acknowledges that it did not initially object to the inclusion of the §4C1.1 adjustment in the draft PSR. Upon further review of the video evidence in this case in preparation for sentencing, however, the government has revised its position and submits that the §4C1.1 adjustment is not appropriate here.

submits that the Zero Point Offender adjustment is not appropriate in this case. *See United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (defining "violence" for §4C1.1 purposes as  the "use of physical force" … "accompanied by fury, vehemence, or outrage")

In the alternative, even if  the Court applies the §4C1.1 adjustment, the Court should vary upward by two levels to account for the reduction under §4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").  Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Moreover, the Sentencing Commission enacted §4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-

reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol

attack, there is no reason to believe this historical data is predictive of recidivism for defendants

who engaged in acts of political extremism on January 6. This is particularly so given the degree

to which individuals, including defendants who have been sentenced, continue to propagate the

same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-

315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that

they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when

such meritless justifications criminal activity have gone mainstream.").

The government agrees with the U.S. Probation Office's calculation of Ciarpelli's criminal

history as a Category I. PSR at ¶ 48. Whether applying the Probation Office's calculation of

offense level of 2 (including the adjustment for §4C1.1) or the government's calculation of offense

level 4 (excluding the adjustment for §4C1.1), Ciarpelli's advisory Guidelines imprisonment range

is zero to six months of incarceration. PSR at ¶¶ 71.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate

sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court

knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and

fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 6 months of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ciarpelli's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, Ciarpelli is more culpable than many other misdemeanor defendants in that Ciarpelli was in the thick of violence on the West Front and even pushed on a lifted bike rack himself as rioters were breaching the assembled police lines.

Here, Ciarpelli was at the vanguard of several breaches on the West Front of the Capitol at critical moments on January 6, 2021. He stepped over bike rack barricades and snow fencing moments after the first perimeters fell on the Pennsylvania walkway to the Capitol from the Peace Circle. He climbed over more barricades when he reached the West Plaza. He joined other rioters in lifting a bike rack barricade and pushing it into a line of officers. He entered the Building shortly after it was breached, and he proceeded to the immediate vicinity of the Senate chamber, where Senators were still hiding, waiting for a safe time to evacuate. He stood there, yelling at officers, while elected representatives huddled under their desks or were evacuated from the House and

Senate chambers. And then, even after he first exited the Building, he trespassed *again* and entered the Building a second time.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.   Ciarpelli's History and Characteristics

As set forth in the PSR, Ciarpelli has no criminal history. He has two children and has been married to his wife for forty years. Ciarpelli's primary income source is rental properties that he manages in and around upstate New York.

Ciarpelli is also a former servicemember, having served in the U.S. Marine Corps from 1973 to 1975, before his honorable discharge. While Ciarpelli's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, Ciarpelli was well aware of the importance of security around restricted government buildings. His voluntary decision to storm a guarded government building is disturbing in light of his former military service and training. In this case, Ciarpelli's conduct and former military service demonstrates a very real need for specific deterrence in the form of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. As discussed previously, Ciarpelli is one of the more culpable misdemeanor January 6 defendants. He was present for and participated in several significant breaches and remained on Capitol Grounds for hours during the riot. And yet, in his interview with the FBI just days after his participation in the riot at the Capitol, he claimed that his trespass onto Capitol Grounds was merely a "little adventure." More, as the Court may recall, Ciarpelli struggled to fully admit his conduct during his change of plea hearing. Under questioning

16

from the Court, Ciarpelli had difficulty taking responsibility for his conduct and acknowledging his behavior on January 6, 2021.

Given his conduct – much of which he recorded himself—it is concerning that Ciarpelli has yet to express real remorse for actions on January 6. His remark to FBI that his trespass into a highly guarded, restricted government Building was a "little adventure" is especially concerning and demonstrates the need in this case for specific deterrence. There should be no question in Ciarpelli's mind going forward that his conduct was unlawful so as to dissuade Ciarpelli from any "little adventures" in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Ciarpelli based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Ciarpelli has pleaded guilty to Count One of the Information, charging him with Entering or Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Anthony Alfred Griffith*, 21-cr-244-CKK, this Court sentenced the defendant to six months of incarceration after the defendant was convicted on four misdemeanor charges. Griffith, like Ciarpelli here, approached the Capitol from the west side after attending the "Stop the Steal" rally, ignored all of the obvious indicia that the Capitol Building and Grounds were restricted, watched as other rioters violently destroyed property and attacked officers to gain entry into the Building, entered the Building multiple times, and encroached deep inside the Building. *See* 21-cr-244, Doc. 153, Govt Sent. Memo at 4-12. Unlike Griffith, Ciarpelli has formally accepted responsibility for his conduct by pleading guilty. But Ciarpelli also witnessed much more criminal conduct by other rioters upon his entry into Capitol Grounds, he participated himself in lifting a bike rack towards police officers, and he showed a keen interest in following wherever other rioters were willing to breach police lines in front of him.

In *United States v. James Robinson*, 22-cr-267-DLF, the defendant was sentenced to six months of incarceration. There, Robinson pled guilty to a single misdemeanor, Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). Like Ciarpelli, Robinson ignored all of the indicia that the Capitol Building was closed, he banged on a window to the Capitol, he clearly saw other rioters fighting with police, and he spent a considerable

amount of time inside the Capitol. *See* 22-cr-267, Doc. 30, Govt. Sent. Memo at 2-15. And while Ciarpelli engaged in pushing a lifted bike barricade outside the Capitol on the West Plaza, Robinson grabbed at an officer's baton inside the Rotunda as the officer attempted to clear the Rotunda of rioters. *See id.* Like Robinson, Ciarpelli's substantial criminal conduct inside and outside the Capitol warrants a sentence of incarceration of 5-6 months.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ciarpelli must pay $500 in restitution, which reflects in part the role Ciarpelli played in the riot on January 6.[5] Plea Agreement at 8-9. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Ciarpelli's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 89.

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 6 months of

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

incarceration, at the high end of the guideline range, twelve months of supervised release, 60 hours

of community service, $500 in restitution, and a $25 special assessment. Such a sentence protects

the community, promotes respect for the law, and deters future crime by imposing restrictions on

Ciarpelli's liberty as a consequence of his behavior, while recognizing his acceptance of

responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Katherine E. Boyles
Katherine Boyles
Assistant United States Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D Street NW
Washington, D.C. 20001
Katherine.Boyles@usdoj.gov
Phone: 203-931-5088